UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

LUCESITA REYES,

                          Plaintiff,

          v.

CAROLYN W. COLVIN,[1]
COMMISSIONER OF SOCIAL SECURITY,

                          Defendant.
_____

<u>DECISION & ORDER</u>

16-CV-6070P

## <u>PRELIMINARY STATEMENT</u>

Plaintiff Lucesita Reyes ("Reyes") brings this action pursuant to Section 205(g) of the Social Security Act, 42 U.S.C. § 405(g), seeking judicial review of a final decision of the Commissioner of Social Security (the "Commissioner") denying her applications for Supplemental Security Income Benefits and Disability Insurance Benefits ("SSI/DIB"). Pursuant to 28 U.S.C. § 636(c), the parties have consented to the disposition of this case by a United States magistrate judge. (Docket # 10).

Currently before the Court are the parties' motions for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure. (Docket ## 12, 13). For the reasons set forth below, I hereby vacate the decision of the Commissioner, and this claim is remanded solely for the calculation and payment of benefits.

---

[1] On January 23, 2017, after this appeal was filed, Nancy A. Berryhill became Acting Commissioner of Social Security.

# BACKGROUND

## I.    Procedural Background

       Reyes applied for SSI/DIB on August 4, 2014, alleging disability beginning on February 28, 2011, due to mental health problems, asthma, high blood pressure, and left ear hearing loss. (Tr. 173, 201, 205).[2] On September 22, 2014, the Social Security Administration denied both of Reyes's claims for benefits, finding that she was not disabled. (Tr. 120-21). Reyes requested and was granted a hearing before Administrative Law Judge John P. Costello (the "ALJ"). (Tr. 122, 145-49). The ALJ conducted a hearing on July 20, 2015. (Tr. 38-95). In a decision dated August 27, 2015, the ALJ found that Reyes was not disabled and was not entitled to benefits. (Tr. 18-37).

       On December 7, 2015, the Appeals Council denied Reyes's request for review of the ALJ's decision. (Tr. 1-6). Reyes commenced this action on February 4, 2016, seeking review of the Commissioner's decision. (Docket # 1).

## II.    Relevant Medical Evidence[3]

### A.    Treatment Records

       Treatment records dated October 15, 2010, indicate that Reyes was referred by her primary care physician to Unity Hospital's Evelyn Brandon Outpatient Mental Health Center ("Evelyn Brandon") for mental health treatment. (Tr. 702-03). Reyes initially met with Jody Levine ("Levine"), MS. Ed MHC, who diagnosed Reyes with depressive disorder, not otherwise specified, and rule out psychotic disorder, not otherwise specified, and assessed a Global Assessment of Functioning ("GAF") of 55. (Tr. 702). The treatment notes indicate that Reyes

---

[2] The administrative transcript shall be referred to as "Tr. __."

[3] Those portions of the treatment records that are relevant to this decision are recounted herein.

had been referred due to the onset of depression following a second trimester miscarriage in August 2010. (Tr. 633, 702-10). Reyes complained of depression, anger, insomnia, confusion, and visual and auditory hallucinations involving the child she lost. (*Id.*). Reyes also indicated that she had difficulty focusing and concentrating, memory problems, decreased motivation, energy and interest, and feelings of guilt and worthlessness. (*Id.*). Levine recommended psychotherapy up to four times per month, cognitive behavioral therapy and supportive therapy, and a psychiatric evaluation. (*Id.*). Reyes received mental health treatment at Evelyn Brandon during the latter part of 2010 and the early part of 2011. (Tr. 645-48, 680-701).

Reyes began treatment with Crystal L. Keefer ("Keefer"), LMSW, in April 2011. (Tr. 673-79). Reyes told Keefer that since her miscarriage she had experienced difficulties with memory and sleeping, increased anger and irritation, and periods of "black[ing] out" followed by an inability to recall her actions. (*Id.*). On July 29, 2011, Reyes was evaluated by Isis W. Bottros ("Bottros"), MD. (Tr. 632-36). Reyes reported that she had been prescribed Prozac by her primary care physician in late April 2011, which had improved her mood, sleep, and functioning. (*Id.*). Bottros opined that Reyes demonstrated signs of postpartum depression and found no evidence of psychosis. (*Id.*). She prescribed Prozac, referred Reyes to bereavement group therapy, and recommended that she continue individual therapy. (*Id.*).

In June 2011, Reyes informed Keefer that Child Protective Services ("CPS") had reopened a pending investigation concerning her daughter's welfare due to recent reports of household fighting. (Tr. 661). Later that year, Reyes reported to Keefer that she was pregnant and had stopped taking mental health medication. (Tr. 585, 604-05). In December 2011, a fire occurred in Reyes's apartment, and she moved in with her sister. (*Id.*).

The treatment notes demonstrate that Reyes continued receiving treatment from Keefer throughout the remainder of 2011 and 2012. (*See* Tr. 574-688). During that time, Reyes met with Keefer approximately twice per month. Reyes generally presented as anxious and depressed, with restless motor behavior, poor concentration, and preoccupied thoughts, including guilt and worthlessness. (*See*, *e.g.*, 577, 581, 585, 589, 592-93, 596-97, 600-01, 604-05, 609, 617, 624-25, 629). In April 2012, Reyes informed Keefer that her daughter's school had contacted CPS after her daughter had informed her teacher that there was no food in the home. (Tr. 592-95). In September 2012, Keefer also diagnosed Reyes with a learning disorder, not otherwise specified, due to her persistent difficulties with reading and writing. (Tr. 577). According to Reyes, in addition to having a hearing disorder, she had learning difficulties as a child. (*Id.*). She reported that she was unable to assist her daughter with homework and had difficulty reading forms and signing her name. (*Id.*).

On March 22, 2013, Reyes met with Kathleen M. Calnan ("Calnan"), NPP, to restart medication following the birth of her child. (Tr. 921-25). Reyes continued treatment with both Keefer and Calnan throughout 2013. (*See generally*, Tr. 883-920). During that time, Reyes separated from her allegedly abusive husband, and a custody battle over their two daughters ensued. (Tr. 913, 918). In July 2013, Reyes stopped taking her medication because she became pregnant. (Tr. 890, 900). Throughout 2013, Reyes frequently exhibited irritability, depression, anxiety, restlessness, poor concentration, impaired intellect, and thoughts of guilt and helplessness. (Tr. 883-84, 890-91, 893-94, 899-900, 906-07, 913-14, 917-18).

In early 2014, Reyes was hospitalized twice with early contractions, causing her to miss several mental health treatment appointments. (Tr. 877-78). Reyes reported that her pregnancy was considered high risk, which prevented her from engaging in strenuous activity, or

4

taking any psychiatric medications. (Tr. 871-72). Her son was born in March 2014. (Tr. 860). During the delivery, Reyes experienced dangerous hemorrhaging. (Tr. 855).

After the birth of her son, Reyes continued to present as depressed, anxious and irritated, and she reported a reoccurrence of auditory hallucinations involving negative comments and commands to harm others. (Tr. 854, 860-61). Calnan prescribed Risperdal to address the hallucinations, Prozac to address Reyes's mood, and Atarax to address anxiety and assist with sleep. (*Id.*). Reyes continued to have custody disputes with the father of her two daughters. (Tr. 854-55). She also continued to experience command hallucinations, and Calnan apparently increased her Risperdal dosage. (Tr. 802-05, 820, 823, 843-44).

In September 2014, Reyes's father died, and Reyes experienced increased sadness and irritability. (Tr. 820-24). Reyes reported that her irritability caused her to shake and feel like screaming. (*Id.*). According to Reyes, during her periods of increased irritability, her boyfriend cared for her infant son. (*Id.*). Reyes also reported continued auditory hallucinations with negative comments or commands to harm others, but not her children. (*Id.*). Calnan noted that Reyes's medication compliance had been sporadic, but opined that Reyes had poor insight and would need coaching regarding medication compliance strategies. (*Id.*).

Following her father's death, Reyes reported auditory and visual hallucinations involving her father, including instructions from him to burn down a house. (Tr. 814-19). Keefer assisted Reyes with a crisis plan to ensure the safety of her infant son, and Reyes agreed to seek help if she felt unable to resist the auditory commands. (*Id.*). Given this emerging psychosis, Keefer determined to meet with Reyes weekly until Reyes could meet with Calnan regarding her hallucinations. (*Id.*).

In October 2014, Reyes reported increased auditory and visual hallucinations, and increasing difficulty resisting the commands. (Tr. 807-13). Keefer consulted with Calnan and recommended anger management group therapy. (*Id.*). During an appointment with Calnan, Reyes described increased auditory hallucinations and reported that her boyfriend took her infant son to care for him when Reyes was particularly stressed. (Tr. 802-06). According to Reyes, during a recent visit, her boyfriend had found her in a dissociated stated. (*Id.*). Reyes was unable to recall the incident. (*Id.*). She expressed fear that something would happen to her child if she had another episode. (*Id.*). Calnan increased Reyes's Risperdal dosage and recommended referral to a program called Healthy Moms to obtain help to care for her infant son and to monitor her for dissociative states. (Tr. 788, 797). Reyes also reported increased isolation and irritability during this time. (*Id.*).

During November 2014, Reyes continued to present as anxious and irritable. (Tr. 785-95). She reported symptoms of depression and fear that her boyfriend would kidnap her infant son. (*Id.*). Keefer opined that the grief over her father's death appeared to have significantly impacted Reyes's daily functioning. (*Id.*). She considered referrals to grief and loss group therapy or to a depression reduction group. (*Id.*). Reyes reported continued depressed mood and irritability. (*Id.*). She also reported that her sister had found her walking around the kitchen table looking at the floor, but Reyes was unable to recall the episode. (*Id.*). According to Reyes, her ten-year-old daughter indicated that Reyes had engaged in similar behavior on several other occasions. (*Id.*).

Reyes informed Calnan that the increased dosage of Risperdal had reduced the frequency of her auditory hallucinations, although she continued to experience them. (*Id.*). She also reported experiencing hand tremors, which Calnan attributed to the increased dosage of

Risperdal. (*Id.*). Reyes also reported that the Atarax effectively eased her anxiety. (*Id.*). Calnan recommended a slight decrease in her Risperdal dosage to alleviate the hand tremors. (*Id.*). Reyes's anxiety, irritability, depression, and isolation persisted through the end of 2014. (Tr. 772-84).

In January 2015, Reyes reported variable moods and additional dissociative episodes. (Tr. 767-71). According to Reyes, her boyfriend reported an incident during which she became aggressive with him. (*Id.*). During the incident, Reyes repeatedly stated, "Get out of my head," and pushed her boyfriend, threw objects at him, and punched the wall. (*Id.*). After the incident, Reyes was unable to recall anything that had occurred other than hearing voices in her head. (*Id.*). Reyes reported that she was isolating herself in her house due to feelings of paranoia and described feeling as if she were "stuck in between two worlds." (*Id.*). Reyes informed Calnan that she had not decreased her Risperdal dosage as advised, but was able to alleviate her hand tremors with Cogentin. (*Id.*). She reported a continued decrease in the frequency of her auditory hallucinations, although she continued to experience them and found them distressing. (*Id.*).

In February 2015, Reyes presented as anxious and irritable, and reported conflicts at home and the discovery that her boyfriend had cheated on her and that her mother had been diagnosed with early kidney failure. (Tr. 754-66). She reported that her custody battle with her estranged husband persisted. (*Id.*). Reyes had met with staff from Healthy Moms and was considering enrolling in a GED program, although she was hesitant because of her learning disability. (*Id.*).

In March 2015, Reyes reported aggravation of her symptoms, including auditory hallucinations and disassociation. (Tr. 742-53). Reyes indicated that she had difficulty "staying

present" during group therapy and was planning to move closer to her mother. (*Id.*). She told Calnan she experienced auditory hallucinations every other day, including auditory commands to kill others who were harassing her. (*Id.*). She indicated that she experienced incidents of extreme irritability, which included punching a wall and a glass window. (*Id.*). She was also preoccupied with text messages sent by her estranged husband's significant other. (*Id.*). In addition, Reyes reported increased anxiety attacks and periods of dissociation, although she felt that she could care for her son. (*Id.*). Reyes described feeling as though she were "caught between two worlds." (*Id.*). Calnan provided incidental psychotherapy due to Reyes's increased symptoms and provided grounding techniques to help cope with dissociation. (*Id.*).

In April and May 2015, Reyes presented as depressed, anxious, and irritable. (Tr. 719-41). Reyes continued to focus on life-stressors, including her ongoing custody dispute and conflicts with her current boyfriend. (*Id.*). She also expressed apprehension about attending GED classes with other people. (*Id.*). During an appointment in mid-May, Reyes reported that she had experienced auditory hallucinations on Mother's Day, as well as anxiety attacks that day and the following day. (*Id.*). She complained of paranoid thoughts and felt "caught between two worlds." (*Id.*). According to Reyes, she was unable to recall what happened during her periods of dissociation. (*Id.*). She indicated that although she continued to take Risperdal, she occasionally missed a dose. (*Id.*).

Calnan opined that Reyes suffered from low frustration tolerance and low intellectual functioning. (*Id.*). Reyes reported that the ongoing auditory hallucinations caused agitation and thoughts of harming other adults. (*Id.*). Reyes maintained that she was able to care for her children. (*Id.*).

Throughout July and August 2015, Reyes expressed anxiety over her boyfriend's threats to take her son away from her. (Tr. 713-18, 953-63). She also reported that she had missed an appointment with Calnan because her daughter had been burned. (*Id.*). Reyes reported that she did not have any medication refills, although Reyes's pharmacy informed Keefer that prescriptions had been filled in May and never picked up. (*Id.*). Keefer arranged to have the prescriptions filled and delivered to Reyes's apartment. (*Id.*). Keefer noted that Reyes continued to present as anxious, depressed, and irritable, with poor concentration and mild intellectual impairment. (*Id.*). She felt that Reyes, while making progress, continued to have difficulty managing her symptoms. (*Id.*).

Reyes told Calnan that she continued to experience increased irritability and auditory hallucinations. (*Id.*). According to Reyes, she had recently attacked another individual who had threatened her after she heard a command hallucination telling her to "do something – she's going to get you." (*Id.*). Reyes stated that she blacked out during the incident. (*Id.*). Reyes also reported that she no longer was able to take the bus because she felt trapped by the other riders. (*Id.*). She also reported anxiety attacks, characterized by racing heart, temperature extremes, and slow motion feelings. (*Id.*). She also continued to feel "caught between two worlds." (*Id.*). Reyes told Calnan that she was taking Risperdal as prescribed. (*Id.*).

In October 2015, Reyes reported that she continued to hear auditory commands instructing her to harm others, which she did not want to follow. (Tr. 948). She indicated that she felt like two people because of her volatile mood swings. (*Id.*). Reyes also indicated that she had recently obtained custody of her daughters. (*Id.*).

### B.    Medical Opinion Evidence

#### 1.    Yu-Ying Lin, PhD

On September 8, 2014, state examiner Yu-Ying Lin ("Lin"), PhD, conducted a consultative psychiatric evaluation of Reyes.  (Tr. 385-88).  Reyes reported that she had taken a bus to the examination.  (*Id.*).  Reyes indicated that she lived with her three children, aged ten, two and five-months.  (*Id.*).  She had completed the eleventh grade and had been placed in special education classes due to a learning disability.  (*Id.*).  Reyes reported previous employment as a cashier that ended when she had her miscarriage.  (*Id.*).

Reyes reported difficulty sleeping and decreased appetite.  (*Id.*).  She complained of depression, indicated by dysphoric mood, psychomotor retardation, crying spells, fatigue, diminished self-esteem, social withdrawal, and loss of usual interest.  (*Id.*).  Reyes denied suicidal or homicidal ideation, but reported thoughts of hurting people when she was angry.  (*Id.*).  According to Reyes, she also experienced panic attacks and blackouts when she was angry.  (*Id.*).  She reported anxiety characterized by excessive worry, restlessness, difficulty concentrating, muscle tension, and irritability.  (*Id.*).  Reyes reported increased anxiety around other people.  (*Id.*).  Reyes endorsed nightmares, flashbacks, and hypervigilance.  (*Id.*).  She also reported experiencing panic symptoms approximately twice a week, including nausea, trembling, and chest pain.  (*Id.*).  Reyes reported experiencing auditory hallucinations since approximately 2011, seeing shadows, and feeling that people were watching her and would hurt her.  (*Id.*).

Reyes reported that she did not have difficulty cooking, cleaning, doing laundry, or caring for her personal hygiene.  (*Id.*).  Reyes indicated that she was unable to go shopping because of the presence of other people at the store and that her sister shopped for her.  (*Id.*).  Reyes indicated that she was able to take public transportation, but was unable to drive.  (*Id.*).

Reyes reported that she got frustrated easily, had fair relationships with her family, and had one friend. (*Id.*). Reyes stated that she spent her days caring for her children, doing housework, playing with her dog, and watching television. (*Id.*).

Upon examination, Lin noted that Reyes appeared casually dressed and well-groomed. (*Id.*). Lin opined that Reyes had fluent and clear speech with fair expressive language and slightly poor receptive language, coherent and goal-directed thought processes, full range and appropriate affect, euthymic mood, clear sensorium, full orientation, fair insight, poor judgment and borderline intellectual functioning with a limited general fund of information. (*Id.*). Lin noted that Reyes's attention and concentration were moderately impaired due to anxiety and possible limited intellectual functioning. (*Id.*). According to Lin, Reyes was able to perform simple counting, addition, and subtraction, but not multiplication, and could not calculate 20 minus 3. (*Id.*). Reyes's memory skills were impaired due to anxiety and limited intellectual functioning. (*Id.*). According to Lin, Reyes could recall three objects immediately and zero out of three objects after a delay. (*Id.*). Further, Reyes was able to recall three digits forward and two digits backwards. (*Id.*).

According to Lin, Reyes could follow and understand simple directions and instructions and perform simple tasks independently. (*Id.*). She was moderately limited in maintaining attention, concentration and a regular schedule. (*Id.*). She had mild difficulty learning new tasks, but could perform complex tasks with supervision. (*Id.*). Lin also opined that Reyes was moderately limited in her ability to make appropriate decisions and relate adequately with others and markedly limited in her ability to deal appropriately with stress. (*Id.*). According to Lin, Reyes's difficulties stemmed from lack of motivation and stress-related problems. (*Id.*). Lin opined that Reyes's prognosis was fair with continued treatment. (*Id.*).

2.    **V. Reddy, Psychology**

On September 22, 2014, agency medical consultant V. Reddy ("Reddy"), PhD, completed a Psychiatric Review Technique. (Tr. 105-06). Reddy concluded that Reyes's mental impairments did not meet or equal a listed impairment. (*Id.*). According to Reddy, Reyes suffered from mild limitations in her activities of daily living and moderate limitations in her ability to maintain social functioning and concentration, persistence or pace. (*Id.*). According to Reddy, Reyes had not suffered from repeated episodes of deterioration. (*Id.*). Reddy completed a mental Residual Functional Capacity ("RFC") assessment. (Tr. 108-10). Reddy opined that Reyes suffered from moderate limitations in her ability to understand, remember and carry out detailed instructions, maintain attention and concentration for extended periods, perform activities within a schedule, maintain regular attendance, be punctual within customary tolerances, work in coordination with or in proximity to others without being distracted by them, complete a normal workday and workweek without interruptions from psychologically-based symptoms, interact appropriately with the general public, accept instructions and respond appropriately to criticism from supervisors, get along with coworkers or peers without distracting them or exhibiting behavioral extremes, respond appropriately to changes in the work setting, and set realistic goals or make plans independently of others. (*Id.*). Reddy opined that "[the] overall record at this time indicates [that Reyes suffers] mild-to-moderate limitations." (*Id.*). Reddy concluded that "[a]lthough [Reyes] reports [auditory hallucinations] at times, it does seem like [the hallucinations] are interfering with overall functioning at this time."[4] (Tr. 417).

---

[4] In evaluating Reddy's opinion, the ALJ apparently assumed that this sentence contained a typographical error and interpreted the statement as an opinion that Reyes's hallucinations did *not* appear to interfere with her overall functioning. (Tr. 27). The Commissioner also adopts this interpretation. (Docket # 13-1 at 10). Of course, it is not crystal clear that the ALJ's interpretation is correct, but further clarification from Reddy was not sought. To the extent that Reddy actually opined that Reyes's hallucinations did impair her current functioning, such a conclusion would provide further support for this Court's determination, discussed at length below, that the record demonstrates that Reyes is disabled.

### 3.      Keefer and Calnan

On January 28, 2015, Keefer and Calnan completed a Mental Impairment questionnaire related to Reyes.  (Tr. 490-92).  They indicated that Reyes had been diagnosed with major depressive disorder, recurrent severe with psychotic features, and assessed a GAF of 57.  (*Id.*).  According to Keefer and Calnan, Reyes presented as depressed, anxious, irritable, with full orientation, appropriate attire, fair eye contact, fair insight and fair judgment.  (*Id.*).  They indicated that her mental health impairments were characterized by auditory hallucinations, including voices that converse and command violence, depressed mood, anxiety, sleep disturbance, and irritability.  (*Id.*).

Keefer and Calnan opined that Reyes suffered from severe[5] limitations in her ability to understand, remember or carry out one-step instructions; make simple work-related decisions; understand, remember or carry out multi-step instructions; maintain concentration and attention for extended periods; perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; sustain an ordinary routine without special supervision; complete a normal workday/week without interruptions from psychologically-based symptoms; perform at a consistent pace; accept instructions and respond appropriately to criticism from supervisors; and, respond appropriately to changes in a routine work setting.  (*Id.*).  They also opined that Reyes suffered from moderately severe[6] limitations in her ability to remember locations and work-like procedures; ask simple questions or request assistance; work in coordination with or proximity to others without being unduly distracted by them; be aware of normal hazards and take appropriate precautions; get along with coworkers or peers without

---

[5]  "Severe" was defined to mean that an individual was totally precluded from performing the function.  (*Id.*).

[6]  "Moderately severe" was defined to mean that the individual was able to perform at 60-80% of normal expected productivity.  (*Id.*).

unduly distracting them or exhibiting behavioral extremes; and, maintain socially appropriate behavior. (*Id.*). Finally, they opined that Reyes suffered from moderate[7] limitations in her ability to take public transportation and meet basic standards of neatness and cleanliness. (*Id.*).

Additionally, Keefer and Calnan indicated that Reyes likely suffered from a low IQ or reduced intellectual functioning. (*Id.*). They reasoned that Reyes had a history of learning problems in school and had a limited fund of information and problem-solving skills. (*Id.*). They opined that Reyes was likely to experience intermittent symptoms or exacerbations severe enough to cause unscheduled work breaks during a shift of a full-time job. (*Id.*). According to Keefer and Calnan, Reyes's auditory hallucinations interfered with her concentration and sometimes caused her to become irritable and verbally aggressive. (*Id.*). Her mental impairments would also likely cause her to have more than three unscheduled days off work per month. (*Id.*).

## III.    **Non-Medical Evidence**

In connection with her application for benefits, Reyes stated that she was born in 1985, and had previously been employed as a cashier, a cleaner, and a food preparer in a fast food restaurant. (Tr. 201, 206). She lived with her children and spent her days caring for them and performing household chores. (Tr. 220). Reyes indicated that she received assistance with childcare duties. (*Id.*). According to Reyes, she was able to care for her personal hygiene and make daily meals. (Tr. 221). She was also able to do laundry without assistance. (Tr. 221-22).

Reyes reported that she did not drive and had difficulty going out alone because of thoughts that other people were after her. (Tr. 222-23). She indicated she was able to shop

---

[7]  "Moderate" was defined to mean that the individual was able to perform at 80-85% of normal expected productivity. (*Id.*).

for household items and handle her own finances. (Tr. 223). Reyes did not participate in social activities, although she visited her mother approximately once a month. (Tr. 224). She indicated that she had difficulty getting along with others because she sometimes felt that they were "after [her]." (*Id.*).

According to Reyes, she had difficulty paying attention and following written instructions, although she was able to follow spoken instructions. (Tr. 226). She also reported that stress or schedule changes caused her to become forgetful and that she suffered memory limitations. (*Id.*).

During the administrative hearing, Reyes testified that she was thirty years old and supported herself with social services benefits. (Tr. 47). She testified that her son lived with her and she had joint custody of her two daughters, who stayed with her during the summer and on weekends during the school year. (Tr. 48). Reyes testified that she had completed the eleventh grade and had not obtained a GED. (Tr. 48, 55-56). Although she had enrolled in a GED class, she stopped attending after one session due to frustration stemming from reading and comprehension difficulties. (*Id.*).

Reyes testified that she previously worked as a cashier and as a cleaner. (Tr. 49-50, 69). She obtained the cleaner position with her sister's assistance, but she quit as a result of problems getting along with the manager. (Tr. 69). Reyes testified that she had never worked full-time. (Tr. 50).

Reyes testified that she was unable to work due to voices in her head. (Tr. 51). According to Reyes, on at least one occasion she acted on the auditory commands and assaulted someone. (Tr. 51-52). Reyes was unable to recall the incident, but witnesses to the event indicated that Reyes had the individual pinned on the ground and repeatedly punched her until

Reyes was pulled away.  (*Id.*).  Reyes indicated that, just prior to the administrative hearing, a voice had informed her that the building security guard was evil.  (Tr. 53).  Reyes testified that she attempted to ignore the voices – an effort that caused her to shake uncontrollably.  (*Id.*).  She attempted to manage the voices by calling her sister, looking at her son, and taking medication.  (Tr. 53-54).

Reyes testified that she took approximately five medications every day and needed reminders from her mother to do so.  (Tr. 54).  Reyes believed that the medications were sometimes effective to combat the voices.  (Tr. 55).  Reyes testified that she got along with members of her family, but no longer had any friends.  (Tr. 57).

According to Reyes, she typically spent the majority of her day with her son in her mother's apartment.  (Tr. 57-58).  She testified that her mother helped her care for her son, although she was capable of feeding him.  (Tr. 58).  Her mother did the laundry, although Reyes stated that she was probably capable of doing it herself.  (Tr. 59).  According to Reyes, her mother prepared meals.  (Tr. 65).  Reyes also testified that she was generally able to care for her son, but left her son with her mother or his father when she became frustrated or heard voices.  (Tr. 59).  When that happened, she would isolate herself in her apartment.  (*Id.*).

Reyes testified that she often relied on her sister to assist with paperwork and to help her remain calm.  (Tr. 68-69).  According to Reyes, she had difficulty with reading and comprehension.  (*Id.*).  Reyes indicated that she suffered from anxiety or panic attacks characterized by stuttering, shaking, and "spazzing out."  (Tr. 70).  Reyes testified that these episodes had recently increased in frequency from once every other week to once every two or three days.  (Tr. 70-71).  She stated that she was unable to grocery shop or use public transportation because she had difficulty being around other people.  (Tr. 72-75).

Reyes testified that she had been receiving mental health treatment from Keefer every two or three weeks.  (Tr. 62-63).  Reyes typically attended her scheduled appointments, although sometimes they needed to be rescheduled due to misunderstandings.  (Tr. 63).  According to Reyes, Keefer provided her with coping strategies, although Reyes often forgot them after the sessions.  (Tr. 63-64).

Reyes's sister Bralia Reyes ("Bralia") also testified during the hearing.  (Tr. 78).  Bralia lived near Reyes and talked to her every day.  (Tr. 79).  Bralia testified that she assisted her sister to complete applications, provide transportation, and calm her when she felt anxious.  (Tr. 80-81).

## DISCUSSION

### I.  Standard of Review

This Court's scope of review is limited to whether the Commissioner's determination is supported by substantial evidence in the record and whether the Commissioner applied the correct legal standards.  *See Butts v. Barnhart*, 388 F.3d 377, 384 (2d Cir. 2004) ("[i]n reviewing a final decision of the Commissioner, a district court must determine whether the correct legal standards were applied and whether substantial evidence supports the decision"), *reh'g granted in part and denied in part*, 416 F.3d 101 (2d Cir. 2005); *see also Schaal v. Apfel*, 134 F.3d 496, 501 (2d Cir. 1998) ("it is not our function to determine *de novo* whether plaintiff is disabled[;] . . . [r]ather, we must determine whether the Commissioner's conclusions are supported by substantial evidence in the record as a whole or are based on an erroneous legal standard") (internal citation and quotation omitted).  Pursuant to 42 U.S.C. § 405(g), a district court reviewing the Commissioner's determination to deny disability benefits

is directed to accept the Commissioner's findings of fact unless they are not supported by "substantial evidence." *See* 42 U.S.C. § 405(g) ("[t]he findings of the Commissioner . . . as to any fact, if supported by substantial evidence, shall be conclusive").  Substantial evidence is defined as "more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (internal quotation omitted).

To determine whether substantial evidence exists in the record, the court must consider the record as a whole, examining the evidence submitted by both sides, "because an analysis of the substantiality of the evidence must also include that which detracts from its weight." *Williams ex rel. Williams v. Bowen*, 859 F.2d 255, 258 (2d Cir. 1988).  To the extent they are supported by substantial evidence, the Commissioner's findings of fact must be sustained "even where substantial evidence may support the claimant's position and despite the fact that the [c]ourt, had it heard the evidence *de novo*, might have found otherwise." *Matejka v. Barnhart*, 386 F. Supp. 2d 198, 204 (W.D.N.Y. 2005) (citing *Rutherford v. Schweiker*, 685 F.2d 60, 62 (2d Cir. 1982), *cert. denied*, 459 U.S. 1212 (1983)).

A person is disabled for the purposes of SSI and disability benefits if he or she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. §§ 423(d)(1)(A) & 1382c(a)(3)(A).  In assessing whether a claimant is disabled, the ALJ must employ a five-step sequential analysis.  *See Berry v. Schweiker*, 675 F.2d 464, 467 (2d Cir. 1982) (*per curiam*).  The five steps are:

> (1)     whether the claimant is currently engaged in substantial
>          gainful activity;

(2)     if not, whether the claimant has any "severe impairment"
        that "significantly limits [the claimant's] physical or mental
        ability to do basic work activities";

(3)     if so, whether any of the claimant's severe impairments
        meets or equals one of the impairments listed in Appendix
        1 of Subpart P of Part 404 of the relevant regulations;

(4)     if not, whether despite the claimant's severe impairments,
        the claimant retains the residual functional capacity to
        perform his past work; and

(5)     if not, whether the claimant retains the residual functional
        capacity to perform any other work that exists in significant
        numbers in the national economy.

20 C.F.R. §§ 404.1520(a)(4)(i)-(v) & 416.920(a)(4)(i)-(v); *Berry v. Schweiker*, 675 F.2d at 467.

"The claimant bears the burden of proving his or her case at steps one through four[;] . . . [a]t

step five the burden shifts to the Commissioner to 'show there is other gainful work in the

national economy [which] the claimant could perform.'" *Butts v. Barnhart*, 388 F.3d at 383

(quoting *Balsamo v. Chater*, 142 F.3d 75, 80 (2d Cir. 1998)).

### A.     The ALJ's Decision

        In his decision, the ALJ followed the required five-step analysis for evaluating

disability claims.  (Tr. 21-32).  Under step one of the process, the ALJ found that Reyes had not

engaged in substantial gainful activity since February 28, 2011, the alleged onset date.  (Tr. 23).

At step two, the ALJ concluded that Reyes had the severe impairments of anxiety, depression,

and asthma.  (*Id.*).  The ALJ found that Reyes's impairments of hypertension, left ear hearing

loss, and left knee arthritis were not severe.  (Tr. 23-24).  At step three, the ALJ determined that

Reyes did not have an impairment (or combination of impairments) that met or medically

equaled one of the listed impairments.  (Tr. 24-25).  With respect to Reyes's mental impairments,

the ALJ found that Reyes suffered from moderate difficulties in maintaining concentration,

persistence or pace, and in social functioning, and mild limitations in performing activities of daily living. (*Id.*). The ALJ concluded that Reyes had the RFC to perform work at all exertional levels, but had to avoid exposure to respiratory irritants and was limited to performing simple, routine tasks, could have only occasional interaction with coworkers and no interaction with the general public. (Tr. 25-30). At steps four and five, the ALJ determined that Reyes did not have any relevant past work, but that other jobs existed in the national and regional economy that Reyes could perform, including the positions of industrial cleaner and kitchen helper. (Tr. 30-31). Accordingly, the ALJ found that Reyes was not disabled. (*Id.*).

### B. Reyes's Contentions

Reyes contends that the ALJ's determination is not supported by substantial evidence and is the product of legal error. (Docket # 12-1). First, Reyes maintains that the ALJ's mental RFC assessment is not based upon substantial evidence because he erred in evaluating the opinion evidence contained in the record. (*Id.* at 19-26). Next, Reyes contends that the ALJ erred in evaluating her credibility. (*Id.* at 26-28). Finally, Reyes maintains that the ALJ's step five assessment is flawed because it is based upon a flawed RFC.[8] (*Id.* at 29-30).

## II. Analysis

I turn first to Reyes's contention that the ALJ's mental RFC assessment was flawed because the ALJ improperly discounted Keefer's and Calnan's January 2015 opinion. (*Id.*). Specifically, the ALJ stated:

> I accord limited weight to the opinion of Ms. Keefer despite her treating relationship with the claimant. This is not a medical source statement, and it is internally inconsistent. Ms. Keefer

---

[8] In a single sentence, Reyes also contends that the ALJ erred by failing to evaluate whether she met the criteria of Listing 12.03. (Docket # 12-1 at 20 n.21). Having concluded that remand for calculation of benefits is warranted, I need not address this argument.

> stated that the claimant has consistently had a GAF score of 57-58,
> which indicates moderate symptoms rather than severe symptoms.
> If the claimant experienced the severe symptoms indicated by Ms.
> Keefer, then the claimant would be totally precluded even carrying
> out a one-step instruction and would also be totally precluded in
> many other very simple categories. Clearly, based on the treatment
> notes, Ms. Keefer greatly overstated the claimant's limitations.

(Tr. 28-29).

Reyes contends that the ALJ failed to provide good reasons for his decision to discount the January 2015 opinion. (Docket ## 12-1 at 20-25; 14 at 1-6). Specifically, Reyes argues that the ALJ improperly determined that the January 2015 opinion was inconsistent with Reyes's mental health treatment notes indicating that Reyes had a GAF ranging between 57 and 58. (*Id.*). Additionally, Reyes maintains that the only other reasons provided by the ALJ for discounting the opinion – that the opinion was not provided by an acceptable medical source and was inconsistent with the mental health treatment notes – do not constitute sufficient reasons to discount the opinion. (*Id.*).

An ALJ should consider "all medical opinions received regarding the claimant." *See Spielberg v. Barnhart*, 367 F. Supp. 2d 276, 281 (E.D.N.Y. 2005) (citing 20 C.F.R. § 404.1527(d)). In evaluating medical opinions, regardless of their source, the ALJ should consider the following factors:

(1)     the frequency of examination and length, nature, and extent of the treatment relationship;

(2)     the evidence in support of the physician's opinion;

(3)     the consistency of the opinion with the record as a whole;

(4)     whether the opinion is from a specialist; and

(5)     whatever other factors tend to support or contradict the opinion.

*Gunter v. Comm'r of Soc. Sec.*, 361 F. App'x 197, 199 (2d Cir. 2010); *see Spielberg v. Barnhart*, 367 F. Supp. 2d at 281 ("factors are also to be considered with regard to non-treating sources, state agency consultants, and medical experts") (citing 20 C.F.R. §§ 404.1527(d) and (e)); *House v. Astrue*, 2013 WL 422058, *3 (N.D.N.Y. 2013) ("[m]edical opinions, regardless of the source are evaluated considering several factors outlined in 20 C.F.R. §§ 404.1527(c), 416.927(c)").

Under the regulations in effect at the time Reyes's claim was filed, licensed clinical social workers and nurse practitioners are not considered "acceptable medical sources" under the regulations. 20 C.F.R. §§ 404.1513(a), 416.913(a) (previous versions effective until March 26, 2017).[9] Instead, clinical social workers and nurse practitioners are considered "other sources" within the meaning of 20 C.F.R. §§ 404.1513(d) and 416.913(d). As such, their opinions "cannot establish the existence of a medically determinable impairment," *see* SSR 06-03P, 2006 WL 2329939, *2 (2006), and are not entitled to "controlling weight," *see Monette v. Colvin*, 654 F. App'x 516, 518 (2d Cir. 2016). Their opinions may be used, however, "to show the severity of the individual's impairment(s) and how it affects the individual's ability to function." *See id.*

Social Security Ruling 06-03P recognizes that "[m]edical sources . . . , such as nurse practitioners. . . and licensed clinical social workers, have increasingly assumed a greater percentage of the treatment and evaluation functions previously handled primarily by physicians and psychologists." *Id.* at *3. The ruling recognizes that such opinions are "important and should be evaluated on key issues such as impairment severity and functional effects, along with the other relevant evidence in the file." *Id.* The ruling directs the ALJ to use the same factors to evaluate opinions of medical sources who are not acceptable medical sources, including licensed

---

[9] The regulations were amended effective March 27, 2017, to include licensed advanced practice registered nurses as acceptable medical sources, but only with respect to claims filed on or after March 27, 2017. *See Pilaccio v. Comm'r of Social Sec. Admin.*, 2017 WL 2789023, *3 (E.D.N.Y. 2017).

social workers and nurse practitioners, as to evaluate opinions of acceptable medical sources. *See Boyd v. Colvin*, 2016 WL 866345, *4 (N.D.N.Y. 2016); *Genovese v. Astrue*, 2012 WL 4960355, *14 (E.D.N.Y. 2012). Although "[a]n ALJ is not required to give controlling weight to a social worker's opinion[,] . . . he is not entitled to disregard it altogether, [and] he may use his discretion to determine the appropriate weight." *Cordero v. Astrue*, 2013 WL 3879727, *3 (S.D.N.Y. 2013); *Jones v. Astrue*, 2012 WL 1605566, *5 (N.D.N.Y.) ("the Second Circuit has held that 'the ALJ has discretion to determine the appropriate weight to accord the [other source's] opinion based on all the evidence before him'") (quoting *Diaz v. Shalala*, 59 F.3d 307, 313-14 (2d Cir. 1995)), *report and recommendation adopted*, 2012 WL 1605593 (N.D.N.Y. 2012); *Allen v. Astrue*, 2008 WL 660510, *9 (N.D.N.Y. 2008) (although not an acceptable medical source, "[a]s plaintiff's longtime treating psychotherapist and the only treating source who evaluated the disabling effects of plaintiff's mental impairments, [plaintiff's therapist's] opinion was relevant to the ALJ's disability determination[;] . . . [t]hus, the ALJ should have articulated why he discredited [the therapist's] reports").

With respect to Reyes's mental RFC, the ALJ determined that Reyes was able to perform simple routine tasks, but that she could only occasionally interact with coworkers and never interact with the general public. (Tr. 25). In reaching this RFC assessment, the ALJ stated that he gave "limited weight" to the January 2015 opinion authored by Keefer and Calnan.[10] (Tr. 28). In doing so, he seemingly failed to adopt or account for many of the limitations assessed in that opinion, including that Reyes had no functional ability to understand, remember or carry out one-step instructions, make simple work-related decisions, maintain concentration and attention for extended periods, maintain a schedule and attendance, sustain an ordinary

---

[10] Reyes correctly notes that it is not clear whether the ALJ appreciated that the report was also authored by Calnan, the nurse practitioner responsible for monitoring and adjusting Reyes's medication regimen. (Docket # 12-1 at 22 n.26).

routine without special supervision, complete a normal workday or week on a sustained basis, perform at a consistent pace, respond appropriately to criticism, or respond appropriately to changes in a routine work setting. (Tr. 491). The ALJ's mental RFC assessment also appears inconsistent with the documented opinion that Reyes had only a limited ability to remember locations and work-like procedures, ask simple questions, and maintain socially appropriate behavior, and was likely to be absent more than three days each month. (Tr. 491-92).

Having reviewed the ALJ's decision, the record, and the January 2015 opinion, I conclude that the three grounds provided by the ALJ for rejecting portions of the January 2015 opinion do not constitute "good reasons." In his decision, the ALJ acknowledged that Keefer had a treating relationship with Reyes, but accorded her opinion little weight because it was not provided by an acceptable medical source, was inconsistent with the GAF scores assigned by Keefer throughout her treatment of Reyes, and, based upon a review of the treatment notes, "greatly overstated [Reyes's] limitations." (Tr. 28-29).

Although an opinion authored by an "other source" is not entitled to controlling weight, it should not be discounted simply because it was not authored by an acceptable medical source; rather, the ALJ must still evaluate the opinion considering the factors listed above. *See Brown v. Colvin*, 2014 WL 1679761, *5 (W.D.N.Y. 2014) ("as a nurse practitioner and 'other source' opinion, the assessment by that practitioner is entitled to some weight especially where there is a treatment relationship with plaintiff"). In view of the long and intensive treating relationship with Reyes, the ALJ should not have discounted the opinion of Keefer and Calnan simply because neither is an acceptable medical source.

I likewise find that the ALJ's statement that the opinion "greatly overstated [Reyes's] limitations" based upon a review of the "treatment notes" does not constitute a "good

reason" for rejection. The ALJ did not identify anything in the treating notes, other than the GAF scores (discussed below), that is inconsistent with the opinion. Without identifying, let alone explaining, the alleged inconsistencies, the ALJ has failed to provide a justifiable basis for discounting the opinion. *See Marchetti v. Colvin*, 2014 WL 7359158, *13 (E.D.N.Y. 2014) ("[u]nder the treating physician rule, an ALJ may not reject a treating physician's opinion based solely on . . . conclusory assertions of inconsistency with the medical record") (collecting cases); *Ashley v. Comm'r of Soc. Sec.*, 2014 WL 7409594, *2 (N.D.N.Y. 2014) ("this . . . conclusory statement about the treatment records fails to fulfill the heightened duty of explanation"); *Crossman v. Astrue*, 783 F. Supp. 2d 300, 308 (D. Conn. 2010) (ALJ's statement that treating physician's opinion was "inconsistent with the evidence and record as a whole" was "simply not the 'overwhelmingly compelling type of critique that would permit the Commissioner to overcome an otherwise valid medical opinion'") (quoting *Velazquez v. Barnhart*, 2004 WL 367614, *10 (D. Conn. 2004)).

The last reason offered by the ALJ for discounting the opinion – that the functional ratings assessed by Keefer and Calnan were not consistent with their treatment notes that "consistently [assessed] a GAF score of 57-58" – fares no better. (Tr. 28). "The GAF is a scale promulgated by the American Psychiatric Association to assist in tracking the clinical progress of individuals [with psychological problems] in global terms."[11] *Kohler v. Astrue*, 546

---

[11] The GAF scale was removed from the APA's Fifth Edition of the Diagnostic and Statistical Manual of Mental Disorders published in 2013. *See Corporan v. Comm'r of Soc. Sec.*, 2015 WL 321832, *12 n.9 (S.D.N.Y. 2015). Reyes correctly notes that the Social Security Administration ("SSA") issued guidance, which was effective July 22, 2013, before the ALJ rendered his decision in this case, for all state and federal adjudicators concerning how to evaluate GAF ratings in assessing disability claims involving mental disorders. (Docket # 12-1 at 23 & n.28) (citing AM-13066). Reyes argues that the July 2013 guidance cautions ALJs "against reliance on GAF scores," and some courts have interpreted the guidance as "limiting the use of GAF scores" in SSI/DIB cases, while recognizing that the guidance instructs ALJs to continue to treat GAF scores as opinion evidence. *See Tilles v. Comm'r of Soc. Sec.*, 2015 WL 1454919, *33 (S.D.N.Y. 2015) ("the SSA issued an Administrative Message limiting the use of GAF scores[;] . . . the guidance instructs ALJs to treat GAF scores as opinion evidence"); *Gonzalez v. Colvin*, 2015 WL 1514972, *18 (S.D.N.Y. 2015) (same). As discussed below, irrespective of whether AM-13066 further limits the ALJ's consideration of GAF scores, I conclude that the ALJ's reliance on the GAF score as a basis to discount the

F.3d 260, 262 n.1 (2d Cir. 2008) (internal quotations omitted); *see also Petrie v. Astrue*, 412

F. App'x 401, 406 n.2 (2d Cir. 2011) ("GAF is a scale that indicates the clinician's overall

opinion of an individual's psychological, social and occupational functioning"). GAF scores

may be relevant to an ALJ's severity and RFC determinations, although they are "intended to be

used to make treatment decisions . . . and not disability determinations." *Henry v. Colvin*, 2014

WL 652945, *4 (W.D.N.Y. 2014) (internal quotations and citations omitted).

Although the ALJ was permitted to consider whether the opinion is consistent

with the GAF scores assessed by Keefer and Calnan, *see Garcia v. Colvin*, 2015 WL 1280620,

*7 (W.D.N.Y. 2015) (collecting cases), the ALJ was not permitted to discount the assessment

*solely* on the basis of that alleged inconsistency. *See Wiggins v. Colvin*, 2015 WL 5050144, *4

(D. Conn. 2015) ("[t]he [Commissioner] has never viewed GAF scores as dispositive, . . . [a]nd

courts in this Circuit have criticized ALJ's for relying on GAF scores alone as a basis for

rejecting a treating opinion") (citing *Alsheikhmohammed v. Colvin*, 2015 WL 4041736, *8

(N.D.N.Y. 2015) and *Beck v. Colvin*, 2014 WL 1837611, *10 (W.D.N.Y. 2014)); *Garcia v.

Colvin*, 2015 WL 1280620 at *8 (remanding where sole basis for rejecting treating source's

opinion was alleged inconsistency with GAF scores reported in treatment notes); *Hall v. Colvin*,

18 F. Supp. 3d 144, 153 (D.R.I. 2014) ("[t]he ALJ's reliance on GAF scores to discredit or find

credible certain medical evidence was error"); *Price v. Colvin*, 2014 WL 1246762, *7 (D. Kan.

2014) (ALJ improperly discounted treating source's opinion on the grounds that limitations

identified were inconsistent with GAF score assessed by that treating source; "standing alone, a

GAF score, which can reflect social and/or occupational functioning, does not necessarily

evidence whether an impairment seriously interferes with a claimant's ability to work[;]

January 2015 opinion, in the absence of any other good reasons to discount the opinion, warrants remand, even
under pre-guidance authority. On October 14, 2014, the Social Security Administration revised AM-13066. *See
Mitchell v. Colvin*, 2015 WL 5306208, *12 (S.D.N.Y. 2015) (citing AM-13066 REV).

[b]ecause a GAF score may not relate to a claimant's ability to work, the score, standing alone, without further explanation, does not establish whether or not plaintiff's impairment severely interferes with an ability to perform basic work activities") (internal citation omitted); *Carton v. Colvin*, 2014 WL 108597, *14-15 (D. Conn. 2014) (ALJ improperly discounted treating source's opinion on the grounds that "the finding of extreme difficulties is patently inconsistent with [the doctor's] own assessment of a GAF of 55"; "the ALJ erred in relying on the GAF score as an indicat[ion] of the severity of the plaintiff's mental impairment") (internal quotation omitted); *Restuccia v. Colvin*, 2014 WL 4739318, *8-9 (S.D.N.Y. 2014) (ALJ improperly "concluded that [the treating psychiatrist's] opinion was inconsistent with the psychiatrist's own assessment of the claimant's GAF score showing only mild limitations[;] . . . [t]he ALJ did not have a sufficient basis for not according controlling weight to [the psychiatrist's] opinion"); *Daniel v. Astrue*, 2012 WL 3537019, *10 (E.D.N.Y. 2012) (ALJ failed to provide good reasons for giving no weight to treating source's opinions; "[the doctor's] GAF score . . . , while relevant, does not contradict his ultimate finding that [plaintiff] was disabled and unable to work because a GAF score does not have a direct correlation to the severity requirements in the [SSA's] disorder listings") (internal quotations omitted); *Smith v. Astrue*, 565 F. Supp. 2d 918, 925 (M.D. Tenn. 2008) ("the GAF score, alone, cannot discredit [the doctor's] assessment of [p]laintiff's limitations . . . [and] the ALJ's reference to supposed 'inconsistencies' is therefore insufficient to provide 'good reasons' for his assignment of 'little weight' to the opinions of . . . a treating source").  Rather, the ALJ was required to evaluate the January 2015 opinion in light of the factors identified above and in the context of the record as a whole.  *See Walterich v. Astrue*, 578 F. Supp. 2d 482, 515 (W.D.N.Y. 2008) (ALJ improperly discounted treating physician's opinion because limitations assessed were inconsistent with rated GAF score; "[t]he ALJ, however, is not

permitted to rely on any test score alone[;] . . . [n]o single piece of information taken in isolation can establish whether [a claimant is disabled]") (internal quotations omitted).

In sum, I conclude that the ALJ failed to articulate good reasons for discounting the January 2015 opinion authored by Keefer and Calnan. "Sentence four of Section 405(g) provides district courts with the authority to affirm, reverse, or modify a decision of the Commissioner 'with or without remanding the cause for a rehearing.'" *Butts*, 388 F.3d at 385 (quoting 42 U.S.C. § 405 (g)). "Remand is appropriate where, due to inconsistencies in the medical evidence and/or significant gaps in the record, further findings would . . . plainly help to assure the proper disposition of [a] claim." *McGregor v. Astrue*, 993 F. Supp. 2d 130, 145 (N.D.N.Y. 2012) (internal quotations omitted) (*adopting report and recommendation*). In contrast, where there is "no apparent basis to conclude that a more complete record might support the Commissioner's decision," a remand for calculation of benefits, as opposed to further fact gathering, is appropriate. *See Butts*, 388 F.3d at 385-86 (quoting *Rosa v. Callahan*, 168 F.3d 72, 83 (2d Cir. 1999)); *see also Sublette v. Astrue*, 856 F. Supp. 2d 614, 619 (W.D.N.Y. 2012) (remanding for calculation of benefits where medical provider opinions, properly weighed, clearly justified finding of disability); *Salisbury v. Astrue*, 2008 WL 5110992, *8-9 (W.D.N.Y. 2008) (remanding for calculation of benefits; "[t]hese opinions [properly credited], together with the [p]laintiff's testimony, provide substantial evidence to support a finding that the [p]laintiff is disabled within the meaning of the Social Security Act and that further evidentiary proceedings would serve no further purpose").

After reviewing the record, including the opinions of Keefer and Calnan that are entitled to significant weight, I conclude that substantial evidence supports a finding that Reyes is disabled, that no further development of the record would assist the determination, and that a

remand for calculation of benefits is warranted. In reaching this conclusion, I find that the ALJ erred in his credibility determination and that his conclusion that Reyes is capable of performing the mental requirements of competitive work is not supported by substantial evidence. Indeed, my independent review of the record establishes that the limitations assessed by Keefer and Calnan are well-supported by, and consistent with, the evidence of record. If properly credited, their opinion strongly supports the conclusion that Reyes's suffers from a substantial inability to perform the mental activities required for competitive work, justifying a finding of disability.

The treatment records demonstrate that Reyes received ongoing mental health treatment beginning in 2010 and continuing through 2015. During that period, despite therapy and medications, Reyes consistently presented as depressed, anxious, restless and irritable, with poor concentration. Reyes also reported suffering from auditory command hallucinations and periods of disassociation, which persisted despite medication. These symptoms increased in both intensity and frequency following the birth of Reyes's son in April 2014 and the death of her father in September 2014. Although a modification in her medication dosage was initially effective in decreasing the frequency of her auditory hallucinations, she continued to experience them and by March 2015 reportedly experienced them every other day. In the Fall of 2015, despite taking her medication, Reyes reported a serious incident of disassociation during which she physically assaulted another individual after hearing command hallucinations. She also reported ongoing anxiety attacks and frequently complained of feeling as if she were "caught between two worlds."

Many of the limitations assessed by Calnan and Keefer are supported, not only by the treating records, but also by Lin's opinion that Reyes was limited in her ability to maintain attention, concentration and a regular schedule, make appropriate decisions, and relate

adequately with others. Moreover, Lin opined that Reyes suffered from marked limitations in her ability to deal with stress – an opinion that is generally consistent with Calnan and Keefer's opinion that Reyes was unable to perform many work-related activities in a competitive work setting. Although Reddy opined that Reyes suffered only mild to moderate impairments and that her hallucinations did not appear to interfere with her daily functioning,[12] that opinion was rendered in September 2014, before the increased hallucinations and periods of disassociation that Reyes experienced in 2015. *See Welsh v. Colvin*, 2016 WL 836081, *12 (W.D.N.Y. 2016) (ALJ decision not supported by substantial evidence where it relied upon non-examining physician opinion that was based upon an incomplete record) (collecting cases). In any event, the record as a whole does not support Reddy's conclusion that Reyes only suffered from mild to moderate limitations or that her symptoms did not interfere with her daily functioning.

Despite the persistence of Reyes's mental health symptoms throughout her treatment history with Keefer and Calnan, the ALJ concluded that the record does not support Reyes's claims of disability based upon her ability to engage in some daily activities – including caring for her personal hygiene and children, managing her household, and using public transportation – and her failure to comply consistently with her medication regimen. (Tr. 29-30). I disagree. A thorough review of Reyes's treatment history supports Keefer and Calnan's assessment of the severity of Reyes's impairments and her inability to perform work-related activities on a day-to-day basis in a competitive work setting.

As an initial matter, although Reyes's capacity to care for her children is relevant to the disability question, the ALJ's decision suggests that he may have equated her ability to care for her three children with an ability to work. *See Iacobucci v. Comm'r of Soc. Sec.*, 2015 WL 4038551, *7 (W.D.N.Y. 2015). At the very least, the ALJ apparently overlooked or ignored

---

[12] As noted above, Reddy's opinion on this issue is not entirely clear.

substantial evidence that Reyes struggled and required assistance with her childcare responsibilities. For instance, the record demonstrates that CPS was contacted on several occasions and that Reyes's ability to care for her children was the subject of CPS investigations. Indeed, during the initial stages of the custody dispute, her estranged husband was apparently awarded physical custody of the children.

Nor did the ALJ acknowledge Reyes's inability to care for her children during her episodic periods of hallucinations and disassociation. The treatment records and Reyes's testimony demonstrate that she relied heavily upon family and her boyfriend to provide childcare during such periods. With respect to managing her household and preparing meals, although she reported an ability to perform these functions at times (Tr. 219-27, 387), she explained during the administrative hearing that she struggled with these activities and received significant assistance from her mother. (Tr. 57-59, 65-66, 72). Reyes's need for assistance is supported by the treating records, which reflect that Reyes frequently relied upon her family members to provide assistance during periods of overwhelming mental health symptoms and that CPS had been contacted concerning allegations that there was no food for the children at their house.

Although, as noted by the ALJ, the treatment records suggest that Reyes's medication helped diminish some of her mental health symptoms, the record also demonstrates that Reyes continued to suffer from significant symptoms, including auditory hallucinations and periods of disassociation, even with her medication. The ALJ further suggested that Reyes's failure to be fully compliant with her prescribed medication regimen suggests that her impairments were not as disabling as alleged. (Tr. 30). The treating notes, however, suggest that Reyes's struggles with compliance resulted from her poor insight; in fact, Calnan opined that Reyes would need coaching to support her compliance efforts. (Tr. 820-24). Further, the ALJ

failed to address Reyes's hearing testimony that she relied upon her mother to help her manage her medications and ensure her compliance.  (Tr. 54-55).

The record in this case is extensive and contains a comprehensive set of treatment notes documenting Reyes's frequent and ongoing mental health treatment over a period of five years.  It includes an opinion from the mental health providers who treated her consistently during that period, as well as opinions from both examining and non-examining physicians.  Properly credited, the opinion from Reyes's treatment providers supports the conclusion that Reyes does not have the ability to perform the mental activities required to engage in competitive work.  Under these circumstances, a remand for further administrative proceedings is not warranted because there are no inconsistencies or gaps in the record and further evidence does not need to be developed.  *See Bradley v. Colvin*, 110 F. Supp. 3d 429, 447 (E.D.N.Y. 2015) (remanding for calculation of benefits where "the ALJ disregarded a well-developed record with little explanation, giving the [c]ourt no basis to conclude that remanding to obtain additional evidence would support the Commissioner's decision") (internal quotations omitted); *Henningsen v. Comm'r of Soc. Sec. Admin.*, 111 F. Supp. 3d 250, 272-73 (E.D.N.Y. 2015) ("[b]ecause the record provides persuasive proof of plaintiff's disability, [and] proper application of the legal standards would not contradict the weight of this evidence in the record . . . , the proper course of action is to reverse the ALJ [d]ecision and remand the matter to the Commissioner for a calculation of disability benefits") (internal quotations omitted).  Accordingly, remand for the calculation and payment of benefits is warranted.

## <u>CONCLUSION</u>

For the reasons stated above, the Commissioner's motion for judgment on the pleadings (**Docket # 13**) is **DENIED**, and Reyes's motion for judgment on the pleadings (**Docket # 12**) is **GRANTED**.  This matter is remanded to the Commissioner for calculation and payment of benefits.

**IT IS SO ORDERED.**


                                             *s/Marian W. Payson*
                                    _____
                                             MARIAN W. PAYSON
                                        United States Magistrate Judge


Dated:  Rochester, New York
          August 9, 2017